UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLEN HAMMLER,<br><br>         Plaintiff,<br><br>   vs.<br><br>ALLISON, et al.,<br><br>         Defendants. | 1:21-cv-00122-AWI-GSA-PC<br><br>**FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT PLAINTIFF'S APPLICATION TO PROCEED IN FORMA PAUPERIS BE DENIED UNDER 28 U.S.C. § 1915(g). AND THAT THIS CASE BE DISMISSED WITHOUT PREJUDICE TO REFILING THE CASE WITH PAYMENT OF THE FILING FEE**<br>**(ECF No 2.)**<br><br>**OBJECTIONS, IF ANY, DUE IN 14 DAYS** |

## I.  BACKGROUND

Allen Hammler ("Plaintiff") is a state prisoner proceeding *pro se* with this civil rights action pursuant to 42 U.S.C. § 1983.  On January 29, 2021, Plaintiff filed the Complaint commencing this action together with an application to proceed *in forma pauperis* pursuant to 28 U.S.C § 1915(g).  (ECF Nos. 1, 2 .)

## II.  THREE-STRIKES PROVISION OF 28 U.S.C. § 1915(g)

28 U.S.C. § 1915 governs proceedings *in forma pauperis*.  Section 1915(g) provides that "[i]n no event shall a prisoner bring a civil action . . . under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious,

or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."

"This subdivision is commonly known as the 'three strikes' provision." <u>Andrews v. King</u>, 398 F.3d 1113, 1116 n.1 (9th Cir. 2005) (hereafter "<u>Andrews</u>").  "Pursuant to § 1915(g), a prisoner with three strikes or more cannot proceed IFP." <u>Id.</u>; <u>see</u> <u>also</u> <u>Andrews v. Cervantes</u>, 493 F.3d 1047, 1052 (9th Cir. 2007) (hereafter "<u>Cervantes</u>") (under the PLRA,[1] "[p]risoners who have repeatedly brought unsuccessful suits may entirely be barred from IFP status under the three strikes rule[.]").  The objective of the PLRA is to further "the congressional goal of reducing frivolous prisoner litigation in federal court." <u>Tierney v. Kupers</u>, 128 F.3d 1310, 1312 (9th Cir. 1997).

"Strikes are prior cases or appeals, brought while the plaintiff was a prisoner, which were dismissed on the ground that they were frivolous, malicious, or failed to state a claim," <u>Andrews</u>, 398 F.3d at 1116 n.1 (internal quotations omitted), "even if the district court styles such dismissal as a denial of the prisoner's application to file the action without prepayment of the full filing fee," <u>O'Neal v. Price</u>, 531 F.3d 1146, 1153 (9th Cir. 2008).  Once a prisoner has accumulated three strikes, he is prohibited by section 1915(g) from pursuing any other IFP action in federal court unless he can show he is facing "imminent danger of serious physical injury." <u>See</u> 28 U.S.C. § 1915(g); <u>Cervantes</u>, 493 F.3d at 1051-52 (noting § 1915(g)'s exception for IFP complaints which "make[] a plausible allegation that the prisoner faced 'imminent danger of serious physical injury' at the time of filing").

While the PLRA does not require a prisoner to declare that § 1915(g) does not bar his request to proceed IFP, <u>Andrews</u>, 398 F.3d at 1119, "[i]n some instances, the district court docket records may be sufficient to show that a prior dismissal satisfies at least one of the criteria under § 1915(g) and therefore counts as a strike." <u>Id.</u> at 1120.  When applying 28 U.S.C. § 1915(g), however, the court must "conduct a careful evaluation of the order dismissing an action, and other relevant information," before determining that the action "was dismissed because it was

---

[1] Prisoner Litigation Reform Act, 42 U.S.C. § 1997e.

frivolous, malicious or failed to state a claim," since "not all unsuccessful cases qualify as a strike under § 1915(g)." Id. at 1121.

### III.    PLAINTIFF'S ALLEGATIONS

Plaintiff is currently incarcerated at Corcoran State Prison (CSP) in Corcoran, California, where the events in the Complaint allegedly took place.  Plaintiff names as defendants Kathleen Allison (CDCR Secretary), Ralph Diaz (Director of CDCR), Ken Clark (Warden), Correctional Officer (C/O) M. Medina, C/O D. Neve, C/O N. Vera, C/O F. Flores, C/O T. Sanders, C/O Aguirre, C/O Harper, West (Inmate), Sanchez (Inmate), Rodrigues (Inmate), Does #1-9 (CDCR employees), and Doe #10 (Inmate) (collectively, "Defendants").

Plaintiff alleges in the Complaint that he committed a murder on March 9, 2019, at CSP and has been vocal -- in the criminal cases connected to the murder -- that the murder was knowingly facilitated by staff members at CSP.  On September 2, 2020, co-workers of the accused staff members engaged in a campaign of harassment of Plaintiff causing Plaintiff to be viewed by other prisoners in his housing unit as a "snitch" because Plaintiff reported on the correctional officers' involvement in the murder, and because he filed related 602 grievances against those who reproached him for speaking out.  Earlier, on May 7, 2020, Plaintiff was also addressed as a "snitch" by C/Os Vellida and Munoz in front of other prisoners for preparing a 602 complaint.

Being labelled a "snitch" placed Plaintiff in danger.  Other prisoners threatened him daily with violence when walking by his cell, calling him a "snitch."

Defendants C/O Vera, C/O Nave, and C/O Medina illegally searched Plaintiff's cell and removed Plaintiff's legal documents.  Plaintiff discovered this because he saw footprints in his cell from boots, and because his files were out of place.  Some of the documents were taken and shown to other prisoners who loudly made comments on the tier about what they've read, been shown, or spoken about to the officers.

On September 9, 2020, Plaintiff had a disagreement with a staff member about the text of one of his health care appeals and then refused to give her [staff member] the appeal, telling her the appeal was his legal property.  The document attached to the appeal was an email between

two staff members, Heidi KaKudo of the Appeals Branch in Sacramento and Anamarie Ybarra of the CSP Appeals Office, conspiring to justify illegal conduct by a Psych Tech.  Plaintiff believes that Ybarra became desperate to conceal the content of the email and called C/O Medina and asked him to get the 602 back from Plaintiff, which prompted C/O Medina to go to Plaintiff's cell and threaten him with physical violence.  Plaintiff cautioned C/O Medina not to initiate a cell extraction over the legal document, and C/O Medina made a few more random threats and left.

At noon, Transportation Sergeant Flores and another officer arrived to take Plaintiff to Kings County Superior Court for a preliminary hearing on two cases connected to the murder. They searched Plaintiff's legal files that Plaintiff intended to take to court with him, handcuffed and removed Plaintiff from the housing unit and began to place him in the van.  Plaintiff told the officers that he had a right to oversee any search of his legal work product and told C/O Medina there were documents in the file from his attorney and private investigator that were privileged communications.  C/O Medina and C/O Flores put Plaintiff into the van.  Then Medina pushed the cart that had Plaintiff's legal files out of view.  Plaintiff said, "I can't see," and Vera told Plaintiff he didn't need to.  Plaintiff saw the officers take documents out of his files that were evidence in criminal proceedings, but the officers claimed they did not take anything.  Returning from court Plaintiff discovered that some of his 602 appeals were missing from his paperwork.

On October 1, 2020, Plaintiff was interviewed by AIMS[2] investigator C/O Cincion about the murder and threats from officers. At one point Cincion left the office to have the Lieutenant inform him of the status of CSP officials' handling of the threats, and then he left.

A few days after Plaintiff returned from his cell from somewhere, Plaintiff found two of his 602 appeals jammed in between a document he had been working on just before going out, and he knew the 602's were not there before so someone must have returned them.  But one 602 was still missing.

During an interview by SRN Bungabong about another health care appeal, Plaintiff asked

---

[2] Plaintiff has not disclosed the meaning of this acronym.

4

her if she had found the email that she had mistakenly given him, or if she had been given back the 602. She told Plaintiff she didn't know anything about that. She was playing dumb. Later, Plaintiff received the 602 back. Just as the email had said, she [Bungabong] said that Plaintiff had refused to interview seeking to cover up what the email said, omitting to mention it or the events at all as she was mandated to do so.

Earlier, related to a 602 complaint about treatment by Sander's supervisees, Plaintiff had Sanders and others go to defendants West, Sanchez, Doe #10, and other prisoners they knew did not favor Plaintiff, and under the guise of investigating the claims pointed Plaintiff out as a "snitch" and led them to believe that Plaintiff was giving their names as witnesses to an event. Plaintiff argued with Sanchez, who Sanders had directed AIMS investigators to interview, and told Sanchez that he had not directed them to speak to Sanchez. West told Sanchez that Plaintiff must be telling the C/Os to interview him [Sanchez] because Sanchez was not in either of the cells next to Plaintiff's during the events, and C/Os only interview prisoners from the adjacent cells in such event. During the conversation, joined by Doe #10, prisoners began calling Plaintiff a snitch, and this went on for weeks. New prisoners arrived and were told by Doe #10 that they should not speak to Plaintiff and should tell their friends the same at groups, meetings, etc.

West, Sanchez, and Doe #10 began to stay up until 2am and 3am playing loud music and verbally threatened Plaintiff telling him he had better move out of the section. West would yell, "We gonna kill yo' Bitch ass," and Doe #10 would echo it, with Sanchez making other comments.

On June 11, 2020, Plaintiff was in the hallway being treated for chest pains having been upset by a conversation he heard between Sanchez and another Hispanic prisoner. Plaintiff told Sanders and Sergeant Aranda that Sanchez told the prisoner that Aguirre and Harper, both C/O's who were days away from retirement, had told him [Sanchez] that on their last day they would open the cell door and allow them to attack Plaintiff. Plaintiff expressed concern to Sanders and Plaintiff was taken to the Treatment Center for an EKG. While Plaintiff was out, Sanders went to the G-section Tier and starting at cell #174, worked his way down, going from cell to cell asking each prisoner if he [Sanders] had asked them to assault Plaintiff, telling them Plaintiff had just told him that is what he heard one of the prisoners say.

Returning from the Treatment Center, Plaintiff entered the section and had a number of prisoners level death threats, calling him a "snitch" in an unusual group effort.  Once in the cell, Plaintiff asked Johnson, who was in cell #174, if something had happened to result in the prisoners' shouts, and Johnson told Plaintiff what Sanders had asked him and others.

On June 15, 2020, Plaintiff submitted a 602 grievance about the above events, and on August 9, 2020, Plaintiff saw C/O Puga go to West's cell telling him that Sanders wanted to speak to him, then to Doe #10's cell, then to Sanchez's cell.  Once Sanchez was told that it was about a 602, Sanchez declined to speak to C/O Puga.

On the way back to his cell, Doe #10 looked at Plaintiff and shook his head.  In reaching the cell, Doe #10 and West spoke about the text of the 602, having been allowed to read it and loudly proclaimed that Plaintiff had snitched on them.

On January 21, 2021, Vera and C/O Fugate (younger brother of C/O Fugate mentioned above) went to defendant Rodrigues's cell and Vera said, "I gotta pull you out," meaning escort him from his cell.  While Vera handcuffed Rodrigues, Fugate went to Plaintiff's cell and stood there asking what he was working on (legal) but doing so in a suspicious manner.  Twenty minutes later Rodrigues was returned to the cell, and Plaintiff asked, "Was that about me or some of my bull**it?"  Rodrigues said they told him to be careful and talked to him about ordering homosexual books.  Plaintiff knew that homosexual speech had been used by C/Os to incite witnesses.  Plaintiff told Rodrigues he would help him if C/Os sought to coerce or threaten him about filing filed 602's on the condition that if they started they had to go all the way.  Rodrigues agreed but later breached the agreement when Rodrigues refused to go all the way with a 602.  These acts of dissuading witnesses via threats and challenging their manhood through sexual mischaracterization have been used before by these same defendants.

Plaintiff is in imminent danger by being housed among those who want to injure him, which is the result of Defendants painting him as a "snitch" and failing to take action to prevent other prisoners from gaining physical access to Plaintiff.  Defendants also threaten to facilitate an act of violence causing mental distress by inciting others to act violently towards others in violation of First and Eighth Amendment speech.

6

Plaintiff alleges that each of the Defendants' acts were in retaliation for Plaintiff's protected conduct of submitting 602 appeals.  The element of chilling effect is at issue in the violation of his rights.  Plaintiff alleges there was no valid penological goal or reason for Defendants' acts.

Plaintiff requests monetary damages, including punitive damages, injunctive relief and costs of suit.

**IV.    ANALYSIS**

A review of the actions filed by Plaintiff reveals that Plaintiff is subject to 28 U.S.C. § 1915(g) and is precluded from proceeding *in forma pauperis* unless Plaintiff was, at the time the Complaint was filed, under imminent danger of serious physical injury.  Court records reflect that on at least three prior occasions Plaintiff has brought actions while incarcerated that were dismissed as frivolous, malicious, or for failure to state a claim upon which relief may be granted. The Court takes judicial notice of the following cases:

(1)    Hammler v. Director of CDCR, No. 1:17-cv-00097-NJV (N.D. Cal.) (dismissed for failure to state a claim, on April 27, 2017, Doc. No. 10);

(2)    Hammler v. Kernan, No. 3:18-cv-00170-DMS-NLS (S.D. Cal.) (dismissed for failure to state a claim and as frivolous, on December 10, 2018, Doc. No. 11);

(3)    Hammler v. Hough, No. 3:18-cv-01319-LAB-BLM (S.D. Cal.) (dismissed for failure to state a claim and as frivolous, on May 24, 2019, Doc. No. 12); and

(4)    Hammler v. State of California, No. 1:20-cv-00630-DAD-GSA (E.D. Cal.) (dismissed for failure to exhaust appearing evident on face of complaint, on October 30, 2020, Doc. No. 26).

The availability of the imminent danger exception turns on the conditions a prisoner faced at the time the complaint was filed, not at some earlier or later time.  See Cervantes, 493 F.3d at 1053.  "[A]ssertions of imminent danger of less obviously injurious practices may be rejected as overly speculative or fanciful."  Id. at 1057 n.11.  Imminent danger of serious physical injury must be a real, present threat, not merely speculative or hypothetical. To meet his burden under § 1915(g), an inmate must provide "specific fact allegations of ongoing serious physical injury,

or a pattern of misconduct evidencing the likelihood of imminent serious physical injury." Martin v. Shelton, 319 F.3d 1048, 1050 (8th Cir. 2003). "Vague and utterly conclusory assertions" of harm are insufficient. White v. Colorado, 157 F.3d 1226, 1231–32 (10th Cir. 1998). That is, the "imminent danger" exception is available "for genuine emergencies," where "time is pressing" and "a threat . . . is real and proximate." Lewis v. Sullivan, 279 F.3d 526, 531 (7th Cir. 2002).

The Court has carefully reviewed Plaintiff's Complaint and finds it does not contain "plausible allegations" to suggest he "faced 'imminent danger of serious physical injury' at the time of filing." Cervantes, 493 F.3d at 1055 (quoting 28 U.S.C. § 1915(g)).

Plaintiff alleges that he was under "imminent danger of serious physical injury" at the time of filing the Complaint because Defendants had labeled him a "snitch," threatened him with physical injury, and caused other prisoners to threaten him with harm.

These allegations fail to plausibly meet § 1915(g)'s exception for imminent danger. See Cervantes, 493 F.3d at 1055-56 (plaintiff must allege to face a real, proximate and/or ongoing danger at the time of filing); Prophet v. Clark, No. CV 1-08-00982-FJM, 2009 WL 1765197, at *1 (E.D. Cal. June 22, 2009) (finding prisoner's access to the courts, interference with legal mail, and retaliation claims insufficient to satisfy § 1915(g) exception for cases of "imminent danger of serious physical injury"). Plaintiff's allegations of imminent harm are vague and conclusory. Plaintiff has not alleged facts showing that he faced a real, present threat of serious physical injury at the time he filed his Complaint on January 29, 2021. Plaintiff's assertions that he was called a "snitch" and threatened verbally with injury or death are insufficient, without more. Plaintiff has not made specific factual allegations of ongoing serious physical injury, or an ongoing pattern of behavior by other inmates or by any of the named Defendants that placed Plaintiff in imminent danger of serious physical injury. Accordingly, Plaintiff's broad allegations of danger are insufficient.

Therefore, the court finds that Plaintiff may not proceed *in forma pauperis* with this action and must submit the appropriate filing fee in order to proceed with this action. Accordingly,

Plaintiff's application to proceed *in forma pauperis* should be denied and this case should be dismissed, without prejudice, to refiling with payment of the filing fee.

**V.      CONCLUSION AND RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Plaintiff's application to proceed *in forma pauperis*, filed on January 29, 2021, be DENIED under 28 U.S.C. § 1915(g); and

2.      This case be dismissed, without prejudice to refiling the case with payment of the filing fee.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **fourteen (14) days** from the date of service of these findings and recommendations, Plaintiff may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **February 1, 2021**                    **/s/ Gary S. Austin**
                                        UNITED STATES MAGISTRATE JUDGE